1  CHRISTOPHER CHIOU
   Acting United States Attorney
2  District of Nevada
   Nevada Bar Number 14853
3  SUSAN CUSHMAN
   CHRISTOPHER BURTON
4  Nevada Bar Number 12940
   DANIEL CLARKSON
5  Assistant United States Attorneys
   501 Las Vegas Boulevard South, Suite 1100
6  Las Vegas, Nevada 89101
   (702) 388-633
7  Susan.Cushman@usdoj.gov
   Chris.Burton4@usdoj.gov
8  Daniel.Clarkson@usdoj.gov

9  *Attorneys for the United States of America*

10

11                    **UNITED STATES DISTRICT COURT**
                          **DISTRICT OF NEVADA**

12                                          **Criminal Complaint**
                                            Case No.: 2:21-mj-536-BNW
13 UNITED STATES OF AMERICA,                Case No.: 2:21-mj-537-BNW
                                            Case No.: 2:21-mj-538-BNW
14              Plaintiff,                   Case No.: 2:21-mj-539-BNW

15 vs.

16 Paul ENGSTROM, Vincent CUOMO, Abraham    Violations:
   ELLIOTT, and Joseph KRIEGER
17                                          Count One
                Defendants.                 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(ii) –
18                                          Conspiracy to Distribute a Controlled
                                            Substance -Cocaine
19
                                            Count Two
20                                          18 U.S.C. § 1956(a)(1)(A)(i), and  (h) – Money
                                            Laundering Conspiracy
21

22

23

BEFORE the United States Magistrate Judge, Las Vegas, Nevada, the undersigned complainant, being duly sworn, deposes and states:

## COUNT ONE
(Conspiracy to Distribute a Controlled Substance – Cocaine)

From a date unknown and continuing to on or about June 21, 2021, in the State and Federal District of Nevada,

**PAUL ENGSTROM, VINCENT CUOMO, ABRAHAM ELLIOT,
and JOSEPH KRIEGER**

defendants herein, knowingly and intentionally combined, conspired, confederated, and agreed with other persons known and unknown to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), (b)(1)(A)(ii).

## COUNT TWO
(Money Laundering Conspiracy)

Beginning from a time unknown, and continuing to on or about June 21, 2021, in the State and Federal District of Nevada,

**PAUL ENGSTROM**

defendant herein, and others known and unknown**,** knowing that the property involved in financial transactions affecting interstate commerce represented the proceeds of some form of unlawful activity, did combine, conspire, and agree to conduct such financial transactions, which, in fact, involved proceeds of specified unlawful activity, that is, conspiracy to distribute a controlled substance as charged in Count One of this Complaint, with the intent to promote the carrying on of the specified unlawful activity, and knowing the transactions were designed to promote the specific

unlawful activity, in violation of Title18, United States Code, Sections 1956(a)(1)(A)(i), all in violation of Title 18, United States Code, Section 1956(h).

Complainant, Daniel Kurinec, as a Special Agent with the Drug Enforcement Administration (DEA), states the following as and for probable cause:

1.      Complainant is a Special Agent (SA) with the Drug Enforcement Administration (DEA) and an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.  Complainant has been employed by the DEA as a special agent since October 2016.  Complainant is currently assigned to the DEA Las Vegas, Nevada, District Office (LVDO), Enforcement Group 3 (EG3), Financial Investigation Team (FIT), and is responsible for investigating money laundering offenses including but not limited to cases involving drug trafficking, weapons violations, as well as investigations into the activities and operations of criminal enterprises. Your Complainant has experience in conducting criminal investigations, including the investigation of criminal groups and conspiracies, as well as the collection of evidence and the identification and use of witnesses.

2.      As a Special Agent for the DEA, I have participated in numerous narcotics investigations involving various types of controlled substances.  I have received substantive advanced training pertaining to the investigation of various crimes which arise from narcotics trafficking, including money laundering, the use of shell companies to conceal and disguise the proceeds of drug trafficking, and the use of telecommunications facilities in the furtherance of narcotics trafficking.  I have participated in investigations involving the purchase of controlled substances from suspected narcotics traffickers using both undercover narcotics investigators and

1    confidential sources.  I have participated in the drafting and execution of search warrants for

2    narcotics, the proceeds from the sale of narcotics, documentary evidence of narcotics trafficking,

3    and for the telecommunications devices used by narcotics traffickers.  I have also conducted

4    surveillances in connection with narcotics investigations.

5        3.    Through the course of these investigations, I have personally interviewed confidential

6    sources and other persons involved in the distribution of illegal narcotics.  I have also interviewed

7    persons arrested for the distribution of illegal narcotics.  I have spoken with more experienced

8    narcotics investigators with whom I have worked concerning the practices of narcotics traffickers

9    and the best investigative methods to use when conducting investigations of narcotics trafficking

10   organizations.  Through the course of my investigations and through my conversations with more

11   experienced narcotics investigators, I have become familiar with the methods and means utilized by

12   persons who participate in the illegal distribution of controlled substances.

13       4.    The following is based on my own investigation or was provided to me by other law

14   enforcement officers. I have not included every fact known to me concerning this offense.  I have set

15   forth only the facts that I believe are essential to establish the necessary foundation for this

16   complaint.

17                              **PROBABLE CAUSE**

18                                 **COUNT 1**

19       1.    DEA Enforcement Group 3 (EG3), has been investigating the ENGSTROM Drug

20   Trafficking Money Laundering Organization (DTMLO) since October, 2020.  To date the

21   investigation has shown that that Paul Engstrom (ENGSTROM) and codefendants Vincent

22   CUOMO, Abraham ELLIOT, and Joseph KRIEGER were using the dark web to distribute

23   cocaine.

2.      During the investigation, EG3 also learned that ENGSTROM has been conducting large cryptocurrency for cash transactions in order to conceal the proceeds derived from selling cocaine over the dark web. Based on my training and experience, your Complainant knows that cryptocurrency is commonly used by individuals to hide illicit activities. EG3 conducted a criminal background check on ENGSTROM that revealed he had been previously convicted in 2017 in the District of Nevada of Conspiracy to Distribute a Controlled Substance in Case No 2:15-cr-255-JAD-PAL.   On October 16, 2020, EG3 conducted surveillance on ENGSTROM at the residence listed on his Nevada driver's license, 487 Petal Dew Avenue, Las Vegas, Nevada. EG3 observed ENGSTROM carrying a corrugated plastic tote that postal workers typically carry, that say "not for private use." He put the tote in the front passenger seat of a Chevrolet Silverado registered to Vincent CUOMO who was also present at the location. ENGSTROM and CUOMO then entered the garage at 487 Petal Dew Avenue, exited a short time later and then departed the residence in their separate vehicles.

3.       EG3 established video surveillance on 304 E. Silverado Ranch Boulevard between December 10 and 28, 2020. The surveillance captured ENGSTROM, CUOMO and a third individual, Abraham Elliott (ELLIOTT), coming and going from this location in their respective vehicles on a regular basis. In addition, the surveillance revealed a silver Nissan Rogue regularly exiting the garage of the unit in the afternoon. The Rogue was typically gone from the residence for thirty to forty-five minutes before returning. Once the Rogue returned, ENGSTROM, CUOMO and ELLIOTT would leave shortly afterward in their respective vehicles.

4.      On December 29, 2020, EG3 established surveillance in the vicinity of 304 E. Silverado Ranch Boulevard Unit 1110. EG3 observed ENGSTROM, CUOMO and ELLIOTT each arrive at Silverado Ranch at separate times between 1:46pm and 3:28pm in their respective vehicles.

1    Shortly after, the silver Nissan Rogue exited the garage driven by ELLIOTT. EG3 surveilled the

2    Nissan Rogue to a nearby Walmart parking lot located at 490 E. Silverado Ranch, Las Vegas,

3    Nevada. The Nissan Rogue parked next to a black Chevy Sonic located on the east side of the

4    parking lot near the pharmacy. The Chevy Sonic was registered to a Joseph Krieger (KRIEGER).

5    EG3 observed ELLIOTT and KRIEGER open the hatchbacks to their respective vehicles and

6    appear to move something from the Rogue into the Sonic. ELLIOTT and KRIEGER closed the

7    hatchbacks to their vehicles, conversed for a few minutes and then went their separate ways.

8         5.      EG3 continued surveillance on KRIEGER and followed him to a US Post Office

9    located at 1801 N. Martin Luther King Blvd. KRIEGER  deposited several envelopes in the drop

10   box out front of the post office. EG3 immediately contacted the United States Postal Inspection

11   Service (USPIS) as well as the post office management. Upon inspection of the drop box container,

12   EG3 located fifteen USPS Priority Mail Envelopes at the top of the pile. Each envelope had the

13   same return address, the same Priority postage stamp and was labeled the same. The shipping labels

14   were for individuals located throughout the United States, including one for the US Virgin Islands.

15        6.      EG3 contacted the North Las Vegas Police Department and requested assistance from

16   a drug canine unit. Of the fifteen envelopes, the drug canine, alerted on four of the packages,

17   indicating the presence of a narcotic odor or the odor of a controlled substance (heroin, cocaine,

18   and/or methamphetamine) within the Priority envelope. EG3 obtained a search warrant to open

19   and examine the four packages (Case No. 2:20-mj-1114-BNW). All four envelopes contained a

20   white powdery substance that field tested and laboratory tested positive for cocaine. Three of the

21   four envelopes contained approximately four grams each of cocaine. The fourth envelope contained

22   approximately twenty-eight grams of cocaine.

23   …

7.      EG3 identified ENGSTROM, CUOMO and ELLIOTT as co-conspirators utilizing 304 E. Silverado Ranch Boulevard as a "stash house," or a location utilized for the receiving, packaging and distribution of narcotics. EG3 believes that KRIEGER is a "runner" for the DTMLO in order to create further separation between the co-conspirators and their customers.

8.      EG3 surveilled the ENGSTROM DTMLO on several occasions between January and June 2021, observing the same pattern that was used on December 29, 2020. ENGSTROM, CUOMO and ELLIOTT met at the stash house in the afternoon in their respective vehicles. ELLIOTT exited the garage of the stash house in the silver Nissan Rogue and met up with KRIEGER. ELLIOTT delivered a black filing box to KRIEGER. KRIEGER then drove to two or three United States Post Offices to deposit a total of twenty to forty US Priority Envelopes in the drive thru drop box. Occasionally there are minor variances in the above described pattern, but this was the general method of operation for the ENGSTROM DTMLO.

9.      Throughout the investigation, EG3 has identified two separate stash houses. A stash house is a place used to store, process and deliver illicit drugs. The first stash house that EG3 identified is located at 304 E. Silverado Ranch Boulevard, Las Vegas Nevada. EG3 placed a Metro Las Vegas PD drop car at the Silverado Ranch stash house between December 16 and January 4, 2021. The video surveillance showed ENGSTROM, CUOMO, and ELLIOTT on several occasions arriving in their respective vehicles, the silver Nissan Rogue exiting the garage, the Rogue returning to the garage and then ENGSTROM, CUOMO, and ELLIOTT departing in their separate vehicles. ENGSTROM himself or his vehicle, was observed by EG3 on several occasions at the Silverado Ranch stash house including on December 29, 2021, January 7, January 12, January 28, March 15, March 16, and March 29, 2021. On April 13, 2021, EG3 observed GPS Ping data from ENGSTROM's phone that indicated ENGSTROM was in the vicinity of 6145 Harrison Drive.

1   Ground surveillance confirmed that ENGSTROM was parked in front of Unit #4. Surveillance

2   observed CUOMO and ELLIOT both arrive and the Rogue then depart Unit #4. EG3 determined

3   that this was a second stash house. EG3 observed ENGSTROM at the Harrison stash house during

4   June 7 and June 18, 2021 surveillance. During most of these occasions, ENGSTROM was at the

5   stash house when ELLIOTT departed to meet up with KRIEGER and KRIEGER then made

6   mailed the US Priority Envelopes. On several occasions, EG3 surveillance saw ENGSTROM place

7   a black backpack in the trunk of his car and then drive away.  Once ENGSTROM arrives at the

8   stash house, he will retrieve the black backpack from the trunk. Based on training and experience,

9   EG3 believes that there is likely a laptop and/or cocaine in the black backpack.

10      10.     During the course of this investigation, EG3 interdicted and photographed 242 USPS

11  Priority Mail Envelopes believed to have originated from the ENGSTROM DTMLO.  Of the

12  envelopes photographed, forty-four have been seized by EG3 and the USPIS and search warrants

13  have been obtained to examine the contents.  All 44 seized envelopes contained a white, powdery

14  substance that field tested and/or laboratory tested positive for the presence of cocaine. The cocaine

15  seized in thirty-nine of the forty-four envelopes are consistent with amounts for personal use.

16  Cocaine seized in five of the forty-four envelopes constitute a distribution amount. The total amount

17  of cocaine recovered during this investigation exceeded 5 kilograms.

18      11.     In addition to identifying the method of distribution of the ENGSTROM DTMLO,

19  EG3, with the help of UPSIS, also identified the method of sale. When the USPIS became involved

20  in the investigation in January 2021, the look and appearance of the Priority envelopes were similar

21  to those recovered in a 2019 UPSIS investigation. In 2019, USPIS had identified an individual

22  selling cocaine on the dark web under the moniker "Insta" who was located in the Las Vegas area.

23  Prior USPIS investigations have revealed that dark web vendors typically use cryptocurrency to

purchase metered postage strips online. However, "Insta" used Priority stamps which is rare. USPIS investigators believe that the ENGSTROM DTMLO is associated with "Insta" because like "Insta" the ENGSTROM DTMLO used Priority stamps as postage to mail the envelopes which contained cocaine.

12.    In March 2021, EG3 was able to locate "Insta" on the dark web marketplace White House Market. During the month of March 2021, EG3 made two purchases of seven grams of cocaine each from "Insta," using an undercover identity and undercover mailing address. EG3 was unable to intercept the first package directly from the ENGSTROM DTMLO.  The undercover purchase arrived to the undercover address in a Priority envelope with the exact same return address label, packaging and Priority postage stamp as other envelopes that EG3 intercepted from the ENGSTROM DTMLO. On March 29, 2021, EG3 set up surveillance at the 304 E. Silverado Ranch Boulevard stash location. EG3 identified all three vehicles belonging to ENGSTROM, CUOMO and ELLIOTT parked in the vicinity of the stash house. EG3 then observed ELLIOTT exit the garage and drive to the stash house in   the silver Nissan Rogue. EG3 followed ELLIOTT to the nearby Walmart parking lot where he met with KRIEGER. EG3 then saw KRIEGER depart the Walmart parking lot and drive to two US Post Offices. EG3 observed KRIEGER depositing envelopes into the drive-thru drop boxes in front of the two post offices. EG3 then interdicted 21 Priority Envelopes from the first post office and 22 Priority Envelopes from the second post office. Among the 22 envelopes from the second post office, EG3 located an envelope addressed to the undercover identity and address they used to make the dark web purchase from "Insta." EG3 was able to intercept the second undercover purchase directly from the ENGSTROM DTMLO, confirming that the ENGSTROM DTMLO is selling cocaine on the dark web under the moniker "Insta."

13.     When EG3 went on White House Market to make an undercover purchase of cocaine from "Insta" it learned that White House Market requires Monero for the transactions. Monero is a type of cryptocurrency that is untethered, meaning its value is not pegged to the value of gold or fiat money, and is subject to market fluctuations. However, it is a more private type of cryptocurrency. In order for EG3 to make an undercover purchase on White House Market, EG3 set up an account and added a certain amount of Monero to the profile. After making the purchase, the Monero remains in an escrow account with White House Market. Once the cocaine is received, the purchase is validated by the buyer and the escrow Monero is released to the vendor or "Insta" in this case. Your Complainant knows, based on training and experience, that dark web vendors typically convert untethered cryptocurrency like Monero to tethered currency to avoid market fluctuations. While conducting a financial investigation on ENGSTROM, EG3 learned through Currency Transaction Reports (CTR) filed by a local cryptocurrency exchange that ENGSTROM exchanges large quantities of Paxos Standard for cash. Paxos Standard is a type of tethered cryptocurrency that is pegged to the US Dollar.

14.     Verified buyer reviews found on the White House Market show that "Insta" has made over 3,280 cocaine sales between February 1, 2020 and May 23, 2021. "Insta" requires a minimum purchase of 3.5 grams of cocaine which means that the ENGSTROM DTMLO aka "Insta" has sold over twenty kilograms of cocaine on the dark web and distributed that cocaine utilizing the United States Postal Service.

15.     On June 16, 2021, EG3 obtained anticipatory search warrants in Case Nos. 2:21-mj-512-DJA and 2:21-mj-512-DJA.  Pursuant to the warrants, law enforcement interdicted an entire day's worth of parcel deliveries and seized the contents of those packages. On June 18, 2021, EG3 set up surveillance on the ENGSTROM DTMLO. EG3 observed ENGSTROM, CUOMO and

ELLIOTT at the Harrison stash location. ELLIOTT departed the stash and met up with KRIEGER at a nearby Taco Bell parking lot. EG3 observed ELLIOTT and KRIEGER exit their vehicles and exchange black plastic filing boxes. EG3 then followed KRIEGER to two separate post offices where they observed him depositing Priority Mail envelopes in the drive-thru drop boxes. EG3 was able to intercept twenty-nine total USPS Priority Mail Envelopes. In accordance with the search warrant, EG3 seized all twenty-nine envelopes and discovered a white powdery substance in each envelope. EG3 conducted field tests on four of the envelopes, two from each post office as a sample of the larger seizure. All four field tests showed positive for cocaine. In one shipment alone, EG3 intercepted over 300 net grams of cocaine from the ENGSTROM DTMLO.

16.     On June 21, 2021, EG3 executed federal search warrants on three residences (487 Petal Dew Avenue, 10388 Midseason Mist Street, 305 St. Augustine Lane) and two stash houses (6145 Harrison Drive, #4 and 304 E. Silverado Ranch Blvd.) associated with the ENGSTROM DTMLO. ENGSTROM, CUOMO and ELLIOTT were all present at the 6145 Harrison Drive stash house when the search warrant was executed. When law enforcement officers entered the premises ENGSTROM, CUOMO, and ELLIOT were in the process of packaging cocaine for shipment.  ENGSTROM fled to a back office, locked the door, and refused commands to exit the office.  CUOMO and ELLIOT attempted to run out of the back door and where later found hiding under trucks in the garage.   It also appeared that an unknown quantity of a white powdery substance had just been flushed down the toilet. There was a white powdery substance around the toilet bowl, two spoons in the toilet and a metal tray with white powdery residue on the floor near the toilet. Law enforcement officers found multiple open plastic zipper bags on a television tray filled with a white powdery substance. There was a paper drinking cup filled with a white powdery substance next to two scales used for measuring quantities. Four pressed bricks of a white powdery

substance with the embedded insignia "BMW" where recovered from the same office where

ENGSTROM was trying to hide from law enforcement.    In addition, there were two large black

filing cabinets that contained approximately one hundred Priority Mail Envelopes already packaged

and sealed in containers labeled with various quantities of cocaine.

EG3 conducted four random field tests on the white powdery substance as a sample of the larger

seizure. All four field tests tested positive for the presumptive presence of cocaine. In total, EG3

seized 6,800 grams of a white powdery substance that field tested positive for the presumptive

presence of cocaine at the Harrison stash house.

## PROBABLE CAUSE

## COUNT 2

1.      During the course of this investigation EG3 has identified the ENGSTROM

DTMLO as the dark web cocaine vendor "Insta." Your Complainant knows, based on training and

experience, that the ENGSTROM DTMLO receives large quantities of cryptocurrency for its dark

web sales of cocaine. EG3 has discovered, through the financial investigation of the ENGSTROM

DTMLO that, of the members of the DTMLO, Paul ENGSTROM is the one who possesses large

quantities of cryptocurrency, conducts large quantity cryptocurrency-for-cash transactions with the

local cryptocurrency exchange BitLiquid and possesses extensive assets in the form of cars,

motorcycles, rental properties, and land that was all likely purchased with drug proceeds. Further,

EG3 has identified two cryptocurrency wallets in particular, belonging to ENGSTROM that he uses

to manage his cryptocurrency. EG3 has discovered ENGSTROM's use of cryptocurrency mixers or

tumblers to disguise traceable cryptocurrency transactions to make them untraceable. EG3 has

identified multiple bank accounts belonging to ENGSTROM that he uses to make large cash

deposits and then pay for all of his assets.

2.      On January 28, 2021, EG3 surveilled ENGSTROM leaving the stash house with a backpack and drive directly to BitLiquid, Inc. located on Spring Mountain Road. ENGSTROM was then observed leaving BitLiquid, Inc. with an envelope in hand. EG3, through toll analysis on ENGSTROM's phone, was able to see that ENGSTROM communicated with Bit Liquid six times between 2:06pm and 2:21pm on that day. Further, EG3 was able to obtain Bit Liquid's crypto wallet that utilizes the Ethereum platform. EG3 queried Bit Liquid's wallet on etherscan.io (aka Etherscan) to search activity on the Ethereum Blockchain at approximately the time ENGSTROM was observed at BitLiquid. Based on the query, EG3 found that on January 28, 2021, at 4:58pm PST, 37,000 Paxos Standard, was sent from an unknown wallet to BitLiquid's wallet. The transaction amount was valued at $37,000.00 USD. EG3 further confirmed the financial transaction verifying that on January 29, 2021, BitLiquid, in accordance with their obligations as a Money Transmitting Business, filed a Currency Transaction Report (CTR) for the transaction. The report noted that on January 28, 2021, BitLiquid provided cash in the amount of $36,900.00 to ENGSTROM in exchange for cryptocurrency. EG3 believes the $100 discrepancy is the commission amount received by BitLiquid as a fee for the transaction. EG3 was able to verify, based off the CTR, that the unknown wallet that transferred 37,000 PAX to BitLiquid's wallet was in fact ENGSTROM's wallet. Using this information, EG3 was able to use the wallet and additional CTR's filed by BitLiquid to confirm several large quantity cryptocurrency-for-cash transactions between ENGSTROM and BitLiquid.

3.      EG3's financial investigation of ENGSTROM has been unable to locate any legitimate sources of income for the large exchanges of cryptocurrency to cash and subsequent deposits being made by ENGSTROM.   Employers in the state of Nevada are required to report employment income to the Nevada Department of Employment, Training & Rehabilitation

(DETR) for any employees in the state of Nevada for benefit purposes. EG3 subpoenaed Nevada DETR for employment records for ENGSTROM. Any reported employment for an individual would show up on DETR's "Wage Detail Report." Regarding the inquiry for Paul ENGSTROM, DETR reported that there was "no information available." No business entity operating in the state of Nevada pays ENGSTROM wages. Therefore, ENGSTROM's exchanges and deposits are proceeds from cocaine sales over the dark web.

4.      Financial records from one bank account alone belonging to Paul ENGSTROM show 15 incoming wires between January and June 2020 from BitLiquid, Inc., totaling $273,025.00. Following these incoming wires, on June 12, 2020, ENGSTROM then transferred $325,772.70 to Clear Title Company to purchase undeveloped land.

5.      There are numerous examples that EG3 can give of ENGSTROM conducting large quantity cryptocurrency-for-cash exchanges with BitLiquid based off CTRs filed by BitLiquid and then in turn, making large purchases. During the first half of March alone BitLiquid filed CTRs on ENGSTROM for cryptocurrency-for-cash transactions four times: March 3, 2021 in the amount of $80,000; March 6, 2021 in the amount of $20,000; March 10, 2021 in the amount of $50,000; and March 13, 2021 in the amount of $50,000. On March 19, 2021, an 8300 was filed on ENGSTROM and another individual for putting $20,000 down on a Dodge Ram pickup truck. On February 19, 2021, BitLiquid filed a CTR on ENGSTROM for a cryptocurrency-for-cash transaction in the amount of $60,000. On February 20, 2021, an 8300 was filed on ENGSTROM for the purchase of a Harley Davidson Motorcycle for $43,000 in cash. On August 17, 2020, BitLiquid filed two CTRs on ENGSTROM for two cryptocurrency-for-cash transactions in the amount of $14,960 and $34,000. On August 20, 2020, an 8300 was filed on ENGSTROM for the purchase of a Harley Davidson Motorcycle in the amount of $50,000 in cash.

6.     Your Complainant knows, based on training and experience, that "Insta" sells cocaine on the dark web for approximately three times the street value of cocaine in Las Vegas. Utilizing the same numbers included previously, but this time to calculate income, White House Market alone shows that "Insta" has made over 3,280 cocaine sales since February 1, 2020, until May 23, 2021. Based on the 2,310 buyer reviews from verified purchases on White House Market (as of May 23, 2021), and assuming the remaining 970 sales were each for the minimum purchase of 3.5 grams of cocaine, a conservative estimate is that "Insta" has sold over twenty kilograms of cocaine for more than $1.9 million in less than a four-month period (ending May 23, 2021). Further, White House Market imported feedback for "Insta" from other dark web marketplaces, showing a total of 7,562 other confirmed completed sales.

7.     Your Complainant has already demonstrated that ENGSTROM receives large amounts of cryptocurrency through dark web cocaine sales. Cryptocurrency transactions can be traceable based on blockchain analysis. However, cryptocurrency users can use "mixers" or "tumblers" in order to mask their identities, especially if they are conducting illicit activities. On March 4, 2021, EG3 requested assistance from the DEA's Operational Support Division, Cyber Support Section to provide analysis of two transactions conducted by ENGSTROM's crypto wallets. Analysis revealed that ENGSTROM was utilizing coin swap services Changenow and Coinswitch to convert cryptocurrency from one form or multiple forms into PAX standard, a stable coin tethered to the US Dollar for stability. It is likely that ENGSTROM uses coin swap services specifically to avoid detection for his dark web activity.

8.     During the financial investigation, EG3 was able to identify BitLiquid's cryptocurrency wallet. By analyzing BitLiquid's wallet with CTR's filed by BitLiquid, EG3 was able to identify two of ENGSTROM's cryptocurrency wallets. Once the wallets were identified, EG3 was

1  able to analyze the transactions conducted on the two wallets. The first ENGSTROM wallet saw the

2  cryptocurrency equivalent of approximately $1.8 million dollars pass through it between August

3  2020 and February 2021. Approximately $765,000 of it went to Bit Liquid in exchange for U.S.

4  dollars. The second ENGSTROM wallet saw the cryptocurrency equivalent of approximately $1.2

5  million dollars in inflows between February 2021 and April 2021. Approximately $1.05 million

6  dollars went to Bit Liquid in exchange for U.S. dollars.

7       9.      Based on my training and experience, your Complainant believes that ENGSTROM is

8  obtaining large quantities of cryptocurrency through dark web cocaine sales. ENGSTROM is then

9  exchanging his drug proceeds in the form of cryptocurrency for cash. ENGSTROM further cleans his

10  drug proceeds by purchasing cars, motorcycles, land, etc.

11                                   **CONCLUSION**

12       Based on the aforementioned facts, your Complainant believes probable cause exists to

13  believe that **PAUL ENGSTROM, VINCENT CUOMO, ABRAHAM ELLIOT** and **JOSEPH**

14  **KRIEGER** committed offenses in violation of 21 U.S.C. § 846, 841(a)(1) and (b)(1)(A)(ii),

15  Conspiracy to Distribute a Controlled Substance. In addition, your Complainant believes probable

16  cause exists to believe that **PAUL ENGSTROM also** committed Money Laundering Conspiracy in

17  violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (h).

18                                        Daniel Karinec, Special Agent

19                                        Drug Enforcement Administration

20  Attested to by the applicant in accordance with the requirements of
    Fed. R. Crim. P. 4.1 by telephone on June 22, 2021.

21

22  HONORABLE BRENDA WEKSLER
23  UNITED STATES MAGISTRATE JUDGE

16